15-4098 USA v. Carl Robinson 10 minutes for each defendant, 30 minutes for plaintiff Allison Sandler and Michaela Pickett Attorney Steve Baraka Attorney Melissa Perlman Attorney Sandra Smith May it please the court, my name is Allison Sandler, counsel for appellant Christopher Martin. With the court's permission, I would like to reserve three minutes of my time for rebuttal. This case is an appeal from federal programs bribery convictions, which were potentially coerced by the delivery of multiple Allen charges, the improper submission of demonstrative exhibits to the jury's deliberations, and racial bullying of minority jury members. I will address the Allen charge issue, as well as demonstrative exhibits if time permits. Counsel for appellant Robinson will address racial bullying, and counsel for appellant Floyd will address sentencing and forfeiture issues. The validity of an Allen charge is evaluated under the totality of the circumstances. Here, this jury was reminded no fewer than five times that it should seek to reach a unanimous verdict, and the language of the second formal Allen charge was modified to include an appended comment that the jurors should behave like mature adults. Under these circumstances, that second Allen charge was rendered unduly coercive and thus prejudiced Mr. Martin's fundamental right to a fair trial. The defendant has the right to rely on the possibility of disagreement by the jury. It is inherent to his fundamental rights of due process and trial by jury that the jury's verdicts go uncoerced, and an Allen charge explicitly threatens this right, because by instructing the jury that it should seek to reach a unanimous verdict, the trial court runs the risk of making the jury think that it must reach a unanimous decision. There's plenty of, I mean, the Allen charge that's given today has been approved by multiple courts, and I mean, so the issue here is not the Allen charge itself, it seems to me. The issue is the number of times it was given and any language that departed from it. I don't think the Allen charge itself is really the problem, if there is a problem. That's correct, Your Honor. The Allen charge has been explicitly approved for use by this court. However, as you know, this court has expressed a strong preference that trial judges adhere to the language of the Sixth Circuit pattern jury instructions when delivering an Allen charge in order to avoid the charge having an improper coercive effect on the jury. Is there anything about the timing in which the charges were given, be they the circuit-approved charge or the modified charge? Over what period of time were these given, and did that impact in any way what you believe to be the thing that rendered the giving of the charges inappropriate? The number of times that this jury was reminded that it should seek to reach a unanimous verdict after having repeatedly reported to the court through notes that it was deadlocked suggests that this jury was really struggling with this verdict. Over what period of time, though? The jury deliberated over the course of two and a half days in reaching a verdict. So five charges over two and a half days. Correct, Your Honor. How long was the trial? The trial was about two weeks long, I believe, Your Honor. And again, the language of that second modified Allen charge significantly departed from the language that this court has expressed a preference for trial judges to use when giving an Allen charge in order to avoid a coercive effect. The judge instructed the jury that if the jurors could not agree that they were not behaving like mature adults, it suggested that at some point in your lives, all of you have had a disagreement and you've been able to behave like mature adults. And this comment runs the risk of suggesting to the jury that if they cannot come to an agreement on the verdict or on the charges in this situation, that they are not behaving like mature adults. And this was indeed harmful to Mr. Martin. The resulting prejudice here is demonstrated with the speed with which this verdict was rendered after that second Allen charge was offered. And I think this goes to Your Honor's question about the timing here, where this jury had been deliberating over the course of three days and after that final Allen charge was given, it took the jury only three hours to reach a verdict. And it's also important to note that that three-hour period after the final Allen charge also contained lunch, and so three hours is a maximum amount of time that this jury deliberated after hearing this Allen charge. It's possible that they may have deliberated even less at that point. How many times was the actual Sixth Circuit form Allen charge given? It was given twice, Your Honor. The other what you're calling Allen charges are similar or related comments that were made along the way. That's correct, Your Honor. And this court has held in Harris and its precedent that charges that do not contain the full content of a formal Allen charge may be construed as Allen charges. For example, in Harris, the judge commented to the jury that this lawsuit must be decided. It must be decided at some time by some jury. And this court in that case found that this comment in and of itself was an unauthorized extension of the Allen charge that was calculated to have a coercive effect. There's some language. I can't remember it, and I didn't go back. I don't think I looked back as closely at the Sixth Circuit pattern instructions. But when I was looking at Harris, it seems to me that there's some language in the Sixth Circuit pattern instruction that is not Harris language but is pretty close in terms of a reference to the case having to be resolved at another time. Am I right or wrong about that? That's correct, Your Honor. In Harris, after the judge gave this comment that the lawsuit must be decided, the judge then went on to give a much more lengthy instruction, which involves several of the elements that are currently contained in the Sixth Circuit pattern jury instruction. It's important to note, though, that in that case, the court found that in spite of offering these clarifications on the intent of the Allen charge, that clarification did not cure any prejudicial effect of the judge's earlier comment there. And given the Allen charges, did the judge concomitantly remind the jurors of their obligation to decide the case and appraise the evidence to give an individual determination to that in arriving at that decision? That's correct, Your Honor. The risk here is that by continuously encouraging the jury to reach a unanimous decision, insisting that the jury must, using comments such as, I want to be clear that I expect you to continue your deliberations toward the unanimous verdict, the trial court runs the risk of making the jury think that it must reach a unanimous verdict. And my question to you was really poorly phrased, but what I was getting at, I was suggesting that the way the judge gave the Allen charges, it cursed the jury to engage in group think as opposed to an individualized determination as to the evidence or the effect of that evidence. Yes, Your Honor. That's certainly the risk of coercion inherent to an Allen charge, especially when given under circumstances such as these. If the court has no further questions, I will yield the remainder of time to my co-counsel for rebuttal. Thank you. Good morning. May it please the court. Ekaterina Rezis on behalf of Dr. Robinson. As this court indicated, I reserve two minutes for rebuttal. Thank you. Racial animus incapacitated Dr. Robinson's jury. The four persons racially charged accusations against the, quote, colored women, end quote, reduced a juror to tears, almost incited physical violence, and marginalized the voices of African-American jurors based solely on their race, a race they shared with the defendants in this case. Were there only two African-Americans on the jury? There were. Were there any other people of color or other racial ethnicity on the jury? The record does not so indicate, but in the interviews, only some of the white jurors are mentioned, Your Honors. Now, in building upon well-established principles that seek to purge racial prejudice from our criminal justice system, including Tanner, Batson, and others, Pena-Rodriguez adds an additional fail-safe by mandating added precaution for racial bias during deliberation. And the district court's failure in this case to afford an evidentiary hearing, coupled with its insistence on a unanimous verdict, as my co-counsel discussed, requires reversal, or at the very least, remand. Now, Pena-Rodriguez applies when racial bias is explicit and when it implicates the jury's proceedings, when it implicates the impartiality of the proceedings and the resulting verdict, when it acts as a significant motivating factor in a juror's decision to convict. Now, under the totality of the circumstances, this case satisfies Pena-Rodriguez. The jury's reaction to the foreperson's comments indicates that her bias was explicit in this case. Her use of antiquated and offensive racial remarks are the functional equivalent of a racial slur, and that was indicated not only by the reaction of the two African-American jurors in this case, A.R. and M.S., but the reactions of the remainder of the jury. There was a juror reduced to tears not once but twice throughout deliberation. Jurors were running out of the room. And there were two important instances in which, two important aspects, in which the foreperson's bias implicated the verdict, which is really the crux of this case. Not only was her verdict. You say it implicated, you know, you say that it was implicated in the verdict, but the two black jurors denied, I mean, it was their verdict. They were polled. And so I don't know how you get that. I mean, certainly the account of what happened is not a positive one as far as the foreperson's role is concerned. But I don't know that you can jump from there to an influence on the African-American jurors. Certainly, Your Honor. My answer to your question is twofold. First, this court obviously can't be sure, can't jump into a juror's mind, and decide whether 100% that the verdict was implicated by bias. All Pena Rodriguez requires is doubt. And this inquiry must be objective, as it was in Pena. The law already recognizes that people are poor judges of their own personal bias, which is why we have the protections we already have in place, including Batson and Tanner, the ability to ask questions about racial bias during voir dire, the ability to poll jurors after the verdict. So when the jury was polled after the verdict, what was the polling question? Is this your verdict? Yes. So your position is that if in the deliberations the jurors were coerced to adhere or join in the position of the minority, that they could very well have been responding that this coerced verdict is the way they voted. Is that your position? Absolutely, Your Honor. And so your position really is that the racial animus painted arriving at that verdict that they ultimately reported out. Yes. Yes, absolutely. And I'd like to bring to Your Honor's attention a civil case that was upheld by this court, Glassheim v. Freitliner Corporation, a case from 1992 in which this court upheld a declaration of a mistrial by the lower court in which all jurors confirmed in a post-verdict poll that yes, this was their verdict, but the district court judge noticed that two jurors spoke hesitatingly and with some equivocation. And after polling the jurors then individually, privately, one of the jurors disowned the verdict and a mistrial was declared. And this court upheld that verdict. And that was based on nonverbal cues, as was the case here. I mean, the inference you argue is that essentially the two black jurors were mistreated by the poor person who was white and therefore, I mean, they were reportedly upset based on information obtained by Mr. Robinson's counsel in violation of court order. And it doesn't seem to me to necessarily make them more likely to have arrived at a verdict of guilty. It seems like they could make, well, human nature being what it is, have continued in their anger and not agreed to the verdict if their verdict was in fact influenced by what had happened. Your Honor, whether their verdict was in fact influenced is an inquiry for the district court, which is why an evidentiary hearing should have been granted in this case. Perhaps there is more information. Perhaps there are more comments in this case where racial bias breaks down deliberations in light of Pena-Rodriguez. What are we supposed to do about the fact that Mr. Robinson's attorney violated a specific court order as well as the local rules? Your Honor, the fact that the local court rule was the basis for the denial of the motion for a new trial is completely understandable because the judge below, Judge Marbley, didn't have the benefit of Pena-Rodriguez at the time. Furthermore… Pena-Rodriguez explicitly blessed, as it were, the state rules of professional ethics and local court rules which limit counsel's post-trial contact with jurors? I'm reading from Pena-Rodriguez. Yes, and Pena is also… And in Pena-Rodriguez there was no such violation. Is that true? That's true, Your Honor. And the court in Pena-Rodriguez sounded like they were very careful about not creating just an open door to challenges to juries based on anything. They said, we can't turn this into a complete change of the rule that we don't examine jury verdicts. And one of the aspects of it is to point out that there are ethics and local rules that will help in that regard. Now you seem to be reading Pena-Rodriguez to say that all of that is by the boards. Isn't that a strange reading of Pena-Rodriguez? Your Honor, our reading is not so overbroad. What our argument is, is that the district court judge had he had the benefit of Pena-Rodriguez and giving him the benefit of the doubt in this respect. Right, but what I'm asking is why would Pena-Rodriguez affect his analysis if his analysis was to follow, to enforce his own local rules? When Pena-Rodriguez says this case involves no violation of local rules and local rules are important. Sounds like if he had the advantage of Pena-Rodriguez, he would have done the same thing. Your Honor, the local court rule was only part of the district court judge's analysis. He also relied on, and I quote from his opinion, long-standing principles governing inquiries and civility of jury verdicts. And these principles no longer apply. Right, but the rules about enforcing ethics and local court rules do apply. Why isn't that enough, I guess? That's not enough because the underlying premise of Pena-Rodriguez is that an administrative barrier, such as an evidentiary rule, cannot trump a constitutional right to a fair trial. But that's what I'm finding trouble seeing in Pena-Rodriguez. It wasn't the issue there, there wasn't a court rule that was violated there. And indeed, in their opinion, they limited it by saying we're not talking about a case where there's a violation of local court rules. Pena is very broadly written, Your Honor, and it talks about purging racial prejudice from the criminal justice system, allowing a local court rule in light of the totality of the circumstances here, in light of these comments. Kind of disagreeing with the dictum in Rodriguez then. I agree. I agree it's a dictum. I mean, they're talking about something that wasn't before them. But what they seem to say is that case would be different. You're saying, oh, no, even though they said such a case would be different, the real import is that that case would be treated the same. But even though they said that that case would be different, did they say what the judge should do in that case? Because I heard you saying that, and acknowledging the wrongfulness of the lawyer's conduct, but that did the court have any ways of dealing with the lawyer? Because you said in your papers that this sort of undermined the defendant's right to a fair and impartial trial under the Sixth Amendment. That right goes to the defendant, not the lawyer, right? And the right to the fair trial is the defendant's right, the Sixth Amendment right, not the lawyer's. And so the court rule here that the lawyer broke, are there sanctions for the lawyer? That would be up to the district court's discretion, Your Honor. But that is an alternative. I mean, there's a possibility of dealing with that, to sanction the lawyer. To sanction the lawyer, however, to grant an evidentiary hearing so as not to deny the defendant's right to a fair trial. Furthermore, the district court should have the opportunity on remand to consider whether or not a local court rule is applicable in light of veto. I think you're tying us up, and I'm not sure that there are more questions. But I will point out that it wasn't just the local rule. I mean, the court made a specific oral directive to the attorney not to talk to the jury. So it was not just a local rule in this case. But be that as it may, you'll have your rebuttal time. Thank you, Your Honor. May it please the court. Sandra Sanukin for Appellant Shane Floyd. And I would like to reserve two minutes for rebuttal. The focus of my argument is going to be on the burden of proof of loss. The amount of loss under Sentencing Guideline 2C1.1, B2, and 2B1.1, which resulted in a 14-point increase to Mr. Floyd's offense level in this case, and also restitution. Now, the government has the burden of proof to prove contested sentencing enhancement factors by a preponderance of the evidence. In this case, it has failed to prove that the amount of actual loss to the state of Ohio was $420,919. It is a long-standing rule of this court that the government bears the burden of proof to prove sentencing enhancements. It has held so in Feynman in 1991, which in turn cites Silverman, which cites numerous cases in other circuits, which hold that it's the government's burden to prove enhancements, sentencing enhancements under the guidelines by a preponderance of the evidence. More specifically, this court held in Jones in 2011, and in Watkins in 1993, this court held that the government bears the burden to prove the amount of loss under the guidelines that are applicable in this very case, that is, 2C1.1, B2, and 2B1.1. Those are at issue in this very, very case. Nevertheless, the government contends that the amount of the contract, that if a contract is awarded as part of a bribery scheme, that it only needs to prove the gross contract amount, and that the gross contract amount constitutes the loss. It is the government's position that the burden then shifts to the descendant to prove offsets against this loss by proving the fair market value of his services, or of the services of global in this case. In arriving at this conclusion, the government relies on comment 3 to sentencing guideline 2B1.1, and the comment to that guideline only provides that if there is a loss, which has to be proven by the government, the defendant has an opportunity to prove an offset by the fair market value of services rendered or property returned before the loss is discovered. It does not say that the descendant bears the burden of proof to prove any offsets. It never switches the burden of proof from the descendant to prove either the amount of loss or an offset against the loss. Moreover, this court held in U.S. v. Parks 2009 and other cases that the district courts must follow the rule of lenity when faced with ambiguity in sentencing laws. Thus, any ambiguity should be construed in favor of the defendant. Applying the rule of lenity here to comment 3 to guideline 2B1.1, because of the fact that that guideline does not use any language which suggests or places the burden on the defendant to prove offsets, given the court's also their longstanding precedent that the burden is on the government to show loss, Dr. Floyd should not be required to have proven Global's entire contract amount was not a loss. Apart from who has the burden of proof, did Mr. Floyd, I am looking at his objections to the pre-sentence report and I don't have the transcript of the sentencing in front of me, but it looks like he is objecting to the total amount of loss but not making the specific argument as to what should be considered in reducing the $420,000 figure. Is that right or wrong? Well, that's not correct. He objected first to the PSI, written objections to that $421,000. And then at sentencing, he objected and proposed that the loss would be more around $165,000. The judge decided to accept the finding of the PSR and did not do any analysis about burden shifting or anything like that. But the burden shifting would have to be... Did Mr. Floyd articulate the argument that the value of the services actually rendered had to be subtracted from the total loss figure that the government had proved at trial? He did not specifically say that because he never accepted the proposition, as happened in Washington, that he had a burden to prove an offset. The burden... It isn't necessary that he have a burden to have articulated that argument, but he has to at least let the district court know what his theory of calculating the loss is. Well, the available evidence that... And sometimes he did do that because the available evidence that comments C allows to be considered at sentencing is evidence at trial, and Dr. Floyd actually testified at length. He took the stand and testified about how he came to evaluate the value of the contract at $265,000 for an annual contract. And he also discussed all the work that was performed under that contract, which was significant. This was at the sentencing or at trial? This was at trial, but in DeMora and in Randolph and in all the cases that this court... And then also in Jones, this court always looks at the evidence that was presented at trial, whether it's the government trying to... I don't have a problem with... Right. But I do think it is important to articulate the alternative basis on which the loss should be calculated. And, you know, if the district court didn't know what he was looking at, then the district court didn't have too much opportunity to calculate the loss in the way Mr. Floyd suggests. Well, the district court only relied on the trial evidence presented by the government of the gross contract amount. So it was only relying on... Not questioned. It's pretty simple. I'm asking you whether Mr. Floyd's counsel stood there and said, Your Honor, this is an erroneous amount. You must subtract the value of the services that were actually rendered from this total amount. At sentencing... Yes, ma'am. His counsel said that the value, there was only a loss of $165,000 per his calculations based on the trial testimony. And he clues the district court into what the calculations were. He didn't specifically go into, you know, additions and subtractions in terms of, you know... But what he apparently based it on was the 11 months worth of services at $22,000 a month. And I think the court understood that because the court didn't go into trying to have the government establish the loss by preponderance of evidence except just looking at what happened at trial. I mean, both parties have a burden, if we're going to put the whole burden at sentencing, to then, you know, prove their case. The loss and then the offset against the loss. All of the judge's basis was the trial evidence, not any really evidence submitted at sentencing. Just some small amount of argument. He just basically used the trial, the court record, trial court testimony and the gross contract amount. I have a follow-up question. I know. You have your rebuttal time. Thank you. May it please the court, Kim Robinson on behalf of the United States. In light of the court's questions this morning, I'm going to focus on three of the issues in order that they were presented by the appellants. The Allen charges, the juror interviews, and the loss calculation.  Before we go with the Allen charges, I'd like to clarify, there were some questions on the number of Allen charges and the number of comments over the period of time. There were two Allen charges given. Those were the six circuit pattern instructions. They were given on the second and third day of three days of deliberations. There's one additional comment that's separate from those charges that the appellants have raised.  That's the comment regarding, in response to the jury's question, whether they had to decide the charges in order and whether they could proceed to the final charges without just first deciding the first. Are you saying that there were the two pattern Allen charges and then there were a number of modified charges? No. We don't think that there's two pattern jury instructions given on days two and three. On the second jury Allen charge, there was one additional comment that was not part of the pattern. So there were not five charges given? No, that's correct. Was there a modified charge where the judge said, act like mature adults and decide the case? I believe that the second Allen charge, that was part of the instruction. That was on the second day? That was on the third day. Was that before or after there had been the breakdown crying and where the bailiff had to intervene? The second Allen charge was before any of the offensive comments had been made. The second Allen charge on the third day, I am not certain whether it was before or after, but there is no indication on the record that the court had knowledge of any of the comments by the jurors. In fact, the argument of the defendants here has been that the court should have been notified. When the bailiff intervened to basically quiet things down, does the record show that that was brought to the attention of the judge? No, the record does not show that that was brought to the attention of the judge. As I mentioned, the argument here is that it should have been. I believe in the juror interviews, one of them indicates that they think it was not brought to the attention of the court. So we have first the single comment that was not an Allen charge and then the two Allen charges following that. As this court noted, both of the Allen charges were model Sixth Circuit Allen charges. There was no issue with any of those in which the court was singling out minority jurors and asking jurors with a minority viewpoint and asking them to change their view. Let me go back and get one more clarifying thing because I know there is a big difference in this case between two and five. So were there five occasions on which the jurors were brought back into the courtroom and addressed by the judge, whether you say it was an Allen charge or not? I believe there were three occasions. I could be wrong on the number, but I think there were three occasions on which there were things said that are in dispute here. So the Allen charges were model. They weren't pressuring one section of the jury. There is no indication that the judge had any knowledge of a particular split in the jurors. I'm going to ask another question that I think will clarify for me. It was on the second day that the three notes came at one time, and one of those notes was not signed by the entire jury but only by two of the jurors, including the foreperson, and it said, how are we to proceed if one or more juror members feel like the jury is intentionally being hung? District court responded by giving the standard full Allen charge, but the next day when the jury said it didn't think it was going to be able to reach agreement again, that was the point at which the district court gave them the charge that included the mature adult language. Correct. Okay. When considering the first comments, there's two and three, Allen charge, Allen charge. The second one is the one that has the mature adult comment. I think it's helpful to focus on the first of these three comments. That's when the jury sent back the question, can we move on to the additional charges without first deciding the conspiracy charge, and the judge responded with an explanation that they could consider the charges in any order they wanted to and made the comment that is the subject of the briefing here. One of them was said because eventually all of these charges need to be decided. And in the briefing, the parties have taken that one comment slightly out of context, both globally and immediately. Immediately, the district court was responding to a question about, not about deadlock, which is the Allen situation, but whether they could move on to discuss the charges without having decided the conspiracy charge first. And the judge's response clearly indicates that he's dealing with a sequential issue. It says, you know, it's not my place to tell you the order of the questions. There's a certain amount of sense in addressing the issues as addressed, but I'm not going to tell you how to deliberate. You can address them in any order you want to. And then he made this one isolated comment about eventually all these issues need to be decided. And I think in the context of the question by the jury and the comments by the district court, it's clear that he's talking about the order. The jury had not said we are deadlocked. The jury had not said anything along those lines, and the district court had not said anything about how to proceed. And globally, there's a question about how we consider timing. It's not appropriate when considering whether there is error to consider how much time preceded between, under the circuit's law, how much time preceded between an Allen charge and the deliberation or between Allen charges. It is appropriate to consider in terms of harmless error. And it also is important, I think, to consider in terms of the order of the charges. I'm confused a little bit about the distinction you're making. You said it's not proper to consider the time between Allen charges and deliberations, but it's important to consider it on harmless error. Is that a distinction without a difference? It is a distinction that the cases have made. We could not argue, for example, that there was no error in the court's Allen charge because they had deliberated for a certain amount of time. The error question focuses on what the language is and what the court's instructions were otherwise. The prejudice question is separate, so it is maybe a distinction without a difference, but it is the distinction in our court's case law. But I do think that the timing question that the court can consider, that's important to consider, is the sequence of the comments. The eventually decision needs to be reached was made before the two Allen charges, so it would be difficult to interpret that or aggressive to interpret that as being by itself error. Unless the court has any more questions on that, I'll move on to the question of the juror interviews. First, we'll talk about the violation of the local rules, and then we'll move on to the substantive claim. As this court noted, the interviews were conducted both in violation of local rules and the district court's order. At the beginning of deliberations, or at the close of evidence, at the return of the verdict, the district court said because any interviews had not been pre-approved as required by the local rules, that the attorneys should not contact the jurors. Of course, the local rule requires permission before contacting jurors. And these are part of a series of protections by this court intended to protect the jurors from harassment and protect the finality of judgment. Here, the verdict was returned the first week of June. The interviews were conducted without leave of the court by a private investigator in mid-July, and the new trial motion was submitted in September, two days before sentencing, with these publicly filed transcripts that were reported without knowledge of the jurors and submitted including their personal information, cell phone numbers, names, etc. Were there any sanctions levied against the lawyer who violated the court's order and the local rule? No. The district court mentioned in the order, I believe, cited a case regarding sanctions and suggested that sanctions would be appropriate but did not levy any. And you've spoken to the mechanisms in place to protect the jurors from harassment from the lawyers. What's the protection in place to protect the jurors from harassment by other jurors? Certainly, Pino Rodriguez protects the defendant from prejudice in the jury, so protects his jury right. The protection of the jurors, I think, is usually handled by their ability to, first I go back to the instructions by the court, which the jury is presumed to have followed about how to deliberate. The Allen judges themselves, which encourage them to look at the evidence. The voir dire, which tries to ensure that only jurors who are able to decide this case on the evidence. And if you have a situation where there is a discreet and insular minority in the jury room who is, according to your adversary, being harassed or bullied, that's what I'm getting at. What is the institutional protection there? Anything beyond the wording of the instructions? Unfortunately, no, is the short answer. Well, there could be protection if the court had been made aware of what was going on. The jurors certainly are able to notify the court that something is going on. The court has the power to interview the jury during deliberations. They could have sent a question back to the court specifically. So I think that does offer significant protections. I guess that if a situation warranted it, the court could instruct the jurors not to have further contact with each other after the case is closed. Sure, but the judge has to know that at first. Sure, and I think here the disclosure of the juror information does not help protecting the jurors from each other because it allows them to have access to their information post-deliberations. Could the juror, consistent with the orders and the rules, have made a complaint afterwards, gone to the court or gone to the lawyer, maybe even gone to the lawyer for the defendant? Yes, certainly. I think Pena-Rodriguez recognizes that the jurors are certainly permitted to, of their own initiative, talk about the deliberations. The issue here, the first issue here, and I think an important one, is that here the lawyers did it. So that involves different concerns. The jurors are then going to the court. It does nothing to risk their own safety in future trials, but having a lawyer who is willing to look up the jurors and file their information really does. And what the other side argued that the unearthed information from this jury deliberation shows that potentially the defendant's right to a fair trial might very well have been underlined. And so that's their argument. So I'd like you to address that. And I understand that that means that you have to draw some inferences from a number of things, but I'd like you to address that. Sure. I'll start with Pena-Rodriguez. Pena-Rodriguez has a narrow rule, has announced a narrow rule. The holding in that case said that if, in order to get to an evidentiary hearing, if the defendant can show that one of the jurors made racist statements and indicated that there was a nexus with their own vote in that case, then it was possible to ignore the new impeachment rule and proceed to an evidentiary hearing on what happened during jury deliberations. So it required both the racist statement and a specific nexus with their own vote. Here, the claim is on appeal. This was not raised below at all. This is a new claim on appeal regarding the racist statements by the jurors. The claim is that the racist statements by the jury foreperson influenced the votes of the other jurors. But here, unlike Pena-Rodriguez, we have only racist statements. We have nothing indicating nexus to that jury foreperson's own vote, nor do we have anything. You don't think that statement that says, why can't you women, or I find it strange that the two of you are the only two that can't see why the defendants are guilty. I certainly think that's racist. But you don't see that that is like evidence of a connection to their... The juror foreperson's vote? Pena-Rodriguez announces an explicitly narrow rule. There has to be an express indication and not an implication, I think, in light of the concerns of invading the district of the jury. They stated it, I think, aggressively limited. So I think the question is not here whether that implies a possible influence on their own vote. Pena-Rodriguez said racist statements alone are not enough, and I think that makes it clear. But here don't you have those statements and that implication coupled with the statements of the judge saying, you all need to act like adults and come up with a unanimous verdict or something to that effect. Do you look at those in tandem? I think it would be, when we're looking at the Allen charge, I think it would be inappropriate to look at the statements by the jury, which is a slightly different question than you asked, but I think it's worth noting. Because the district court did not have any knowledge of the deliberations, I think it would be... The district court did have knowledge that there was... I think if I had been a district judge and gotten a note that basically was not from all the jury and was basically asking questions about whether another jury or jurors were seeking to intentionally hang the jury, I think I might have felt that some grow-up-and-work-at-your-differences admonition was appropriate. And I sort of took it in that vein. Yes, certainly. What I meant was that they didn't have any knowledge of the content of the deliberations. Certainly he knew that they were having trouble coming to a decision, but he had no knowledge of... Well, and he had some indication, at least, that it would be personal differences. Right. Nothing amounting to the substance. Somebody was accusing somebody else of trying to intentionally hang the jury. Correct. So I think it's important to frame the Allentraunch in terms of the knowledge of the judge. I think your question was more targeted to how to consider this new trial claim. And I think it's fine to consider the... If we were to address that substantively, it would be fine to consider the judge's instructions in that context. But I don't think that those comments satisfy Pena-Rodriguez or help with the Pena-Rodriguez limited holding. Your Honor, I'll ask your opposing counsel, but is it your understanding that their argument is that this fits within Pena-Rodriguez because the foreperson voted on a racial basis or because the two African-American jurors voted on a racial basis? I guess that takes care of three of them, or one of the other nine. My understanding is that their argument is that the two minority jurors voted, both were influenced by the racist comments by the foreperson, not that the foreperson's own vote. Didn't they argue, though, that the comments by the foreperson and the interchange served to contaminate the entire deliberative process? Was that the argument? It is possible. I think that there... But, again, that's not what Pena-Rodriguez allows us to look at. The... Judge Rogers, as you noted, I think it's important to note that Pena-Rodriguez was procedurally distinctive. The Supreme Court did expressly note that there was an important procedural difference. I think it's also important, because the focus here has been on the substantive claim of racism, I think it's important to note not just the procedural violations below, the violations of the local rule, but also what the claim was that the district court judge was considering for the new trial motion. The claim raised below in the new trial motion was one of external influence based on the comments by court staff. It was not that the racist comments had tainted the deliberations or influenced the vote of the foreperson or influenced the vote of the jurors. Pena-Rodriguez came out after the motion for new trial? I mean, after the trial? It certainly came out after the sentencing. So, after the new trial motion. I believe it had been argued before, although I can't... Actually, I'm not certain of that. But no argument raised below based on the racist comments themselves. So the district court had no basis to decide those claims below. And to the extent that their claim is that the racist comments by the foreperson influenced the votes of the minority jurors, if this court is looking at the transcript, which we urge it not to, I think it's worth noting that the jurors themselves stood by their verdict and indicated that the comments had not influenced their vote. So, to the extent that Pena-Rodriguez allows this court to ignore the no-impeachment rule and proceed to an evidentiary hearing... I'm having a problem with the analysis or the assumption that it just influenced the votes of the minority jurors. Because if you have the foreperson who is espousing a stereotype of dangerousness or a stereotype of guiltiness of a defendant, that could just as well affect the votes and the views of non-minorities as it could minorities. And I don't know how you can parse it that narrowly. Certainly, I think it could have. I think we could write Pena-Rodriguez five different ways in order to allow a claim like that to have been brought. But what we're dealing with here is a very limited holding in Pena-Rodriguez that does not allow them to bring a claim like that. And I think that's important to focus on. Do you think that Pena-Rodriguez is the case that we ought to look at? Is there anything else we ought to look at in working our way through this? There's nothing else that would allow this court... Certainly, I think cases involving the violation of local rules and the importance of the finality of the verdict and protection of the jurors are important. In terms of the substantive claim, you can look at... If, to the extent that they're still raising the external influence claim below, you can certainly look at external influence claims because that's one way of jumping through the no-impeachment rule. And the only other way that is relevant here is Pena-Rodriguez. So, I think you either have to go through external influence or Pena-Rodriguez. The final thing that I think the defendants have addressed here, that counsel addressed here, is loss. So, I'll use that to conclude my argument here unless the court has further questions. Because there were some questions from the court on what was argued below, I'd like to clarify that. In the United States sentencing memo below, it indicated because global services were a sham, it was appropriate to use the entire amount that they received as the loss figure here. The district court didn't rely on that, though. The district court did not make an express finding on that. In their final comments to the defendants, it did indicate that it thought the purpose of this was a sham. So, it didn't make an express ruling on that, you're right, but I think it's clear from the record what it would have been. And I don't think there's anything that required it to make an express finding on that basis. Why not? It certainly is required to announce it. To decline, to reduce the loss for services given. I mean, there were some people who were actually on site doing clerical work and getting paid $2,000 a month or whatever it was, right? I mean, that's included in what's being treated as loss, right? I mean, you would think that that should be reduced. The argument raised by the defendants below in response to the PSR was that they shouldn't be held responsible for the amounts that their co-conspirators had raised. And so the district court that they were responsible for, they sort of wanted to apportion it by cause and effect of co-conspirator. And so at the sentencing hearing, the district court judge addressed that argument and made a loss finding. So, they addressed all the specific arguments raised by the defendants, which is their obligation. And certainly they're obligated to announce their finding on loss, which they did here. But they weren't obligated to address an argument that was not made. So, you're saying that the argument that was raised below had to do with apportioning among the co-conspirators and did not at all involve a reduction for services provided. That's correct. And here, because any services provided from Global were a sham, it's not necessary to make any subtraction for services provided. And here we have testimony from Mr. Ward indicating that they only formed Global to facilitate the scheme. We have the comments by the district court at the end. They could have had that purpose and still provided some services. I thought there was evidence in the trial that there were services provided. They could have. But the cases in this circuit indicate that if they provide some services, but the purpose of the services is to cover for their sham organization, you don't need to subtract those. And here, that is what happened. The district court didn't make any findings on that because the argument was not formulated in that case. No, the argument was not formulated. But I think it's clear from the district court's final comments on sentencing that it believed the entire organization was a sham. Beyond that, because they did not include anything below, and even on appeal, the services that they included or the figures that they pointed to were not included in the proper form. There's some discussion of the salaries of two employees and a figure that represents the amount of students who were recruited to the school by Mr. Ward. The proper figure, if there had been an argument below, which there was not, would have been the fair market value of the services, not how much they were paid. It doesn't really matter what they were paid. What matters is what they were worth. Similarly, the dollar value of the students recruited was not the appropriate value. It's the fair market value of the salary of the man who recruited the students. Here, the district court said at the end of sentencing, the only reason you recruited students was to get more money to line your pockets. I understand that, but this is a vague memory from when I read the briefs, but there were two people who were actually employed and actually on site. Yes, there were. But there was no real evidence that any of their services were worthwhile. So that is the important question, I think, here. The fact that they paid people. They were just in an office. They were doing a lot of paperwork. It's unclear what they were doing. Did the school ever actually operate? The school operated, yes. So for the year in which this conspiracy was going on, at the beginning of the year it was operational and teachers were getting paid. By the end of the year, teachers were not getting paid. Their health insurance was not paid for. They were in significant debt and they weren't able to pay all the other vendors, even though Global was getting half a million dollars. And within about another year, then the school went under. The government's theory is that even though there were PowerPoint presentations and even though there were employees who were paid to be in the building, that all of that was just window dressing to cover up the fact that they were getting money and all of that stuff was worthless. That is correct. I think it's important to note that we were not charging a services not rendered case. But beyond that, the only services that were argued were the salaries of the two employees and two teacher training sessions of the teachers. That's it for a year and half a million dollars. That was not argued, though. That was not argued. That's correct. Thank you. Unless this court has any further questions. I don't think so. Thank you. May it please the court. My name is Michaela Pickus. On behalf of appellant Christopher Martin, I will be addressing the issues raised by appellees on the Allen charges. First, appellees incorrectly minimizes the coercive effect of the judge's language. Appellees contend that there were two Allen charges. This is incorrect. There were five. This court has expressed a strong preference outside any language that comes outside of the traditional jury instruction. This is a totality of the circumstances analysis, your honors. And here, three modified Allen charges were given in addition to the two pattern instructions. First, the judge said, I would encourage you to resolve the conspiracy issue because ultimately all of these issues have to be resolved. And this directly mirrors language given by the judge in the United States v. Harris. There, the judge said, this lawsuit must be decided. It must be decided at some point. This was decided to be coercive by this court, and it was decided to be a modified Allen charge. What is the reference in the approved Allen charge to the case having to be decided at some point? What is that exact language? For comparison purposes, it might help. That was the first modified Allen charge, and it was not attached to a pattern. No, no. I mean, if I look in the Sixth Circuit pattern instruction, it's going to have some language about the case having to be resolved at some point. What is that language? Your honor, I don't have any language in front of me that that would correlate to. Okay. In addition to that modified Allen charge and the two pattern instructions, another statement came on day two of the deliberations in which the judge said, I want to be clear that I expect you to continue your deliberations toward a unanimous verdict. And on the third day, there was a mature adult language attached to the second pattern Allen charge. Considering that this court in the United States v. Scott said that they have a strong preference outside of any language coming out of the pattern instruction and the totality of the circumstances analysis, as well as the continued insistence by the jury that they cannot come to a unanimous agreement. At one point saying, if we can't agree on count one, can we rule on the other counts? At one point they said, I think we're being intentionally hung. At another point they said they don't think they can come to a unanimous verdict. The judge continued to push the jury into doing so. And under a totality of the circumstances analysis, this is simply plain error. Second, I would like to address that the record doesn't show when the Allen charges were made in relation to racial bullying issues and that this could be explored on remand. Your Honors, I see that my time is nearly up. Do you agree that the plain error standard review applies to the arguments you're making? I believe that this falls under the plain error standard, but also that our attorneys below did object to the first Allen charge before it was given. And the judge said your objection is noted, so this could also be reviewed under review. That was the first Allen charge? Yes, Your Honor. Plurality of the Allen charges or the content of the subsequent comments is plain error? Yes, Your Honor. Thank you. Thank you. Your Honor, three points on rebuttal today for Mr. Robinson. First, the appellee miscategorizes the application of Pena in this case. There were two ways that the bias implicated the verdict, one of which was a harassment of jurors A.R. and M.S., and as Your Honor mentioned, other jurors as well. However, as in Pena, the four-person bias in this case, is enough to satisfy Pena. This was not one stray comment, one isolated incident. The four-person's immediate assumption that there was some deficiency for the two African-American women based solely on their race, this was after the initial jury poll without any deliberations having taken place. The four-person assumed that the African-American jurors were not capable of honestly voting their conscience. This goes to the heart of the charges against the defendants in this case and the four-person's bias translates directly to the defendants. In fact, even prior to Pena-Rodriguez, courts have recognized that bias against a class of persons can translate directly and applies with equal force against the defendants. Two specific instances for the court. The Connecticut Supreme Court in State v. Santiago, back in 1998, stated that a juror who displayed racial bias toward other jurors of the same race as the defendant would not be able to impartially judge the guilt of the defendant. The Second Circuit used similar logic. Racial bias can lead people to lie and distort their testimony, even though the bias is directed generally against a class of persons and not directly against the accused. And even counsel for the government admitted that these comments were in fact racist and the four-person's comments alone are enough to satisfy Pena-Rodriguez. My second point is with respect to Judge Rogers' question about the jurors being able to come forward voluntarily to report the misconduct. There's a key difference between this case and Pena-Rodriguez, which is that the judge in Pena instructed jurors at the end of the trial that coming forward voluntarily was an option and the judge conceded in this case that he failed to do so. And under the totality of the circumstances in this case, the multiple Allen charges, the deputy clerks, communications with jurors in the bathroom, telling them to continue deliberating. Under the totality of the circumstances, coupled with the fact that the judge forgot to mention that jurors could come forward voluntarily. Well, excuse me, what leads you to believe that judges normally do that? The judge stated in this case that he normally talks to jurors in all of his cases, but that is a key distinction with Pena-Rodriguez. Many district judges do not, and there's no requirement that they do so. Certainly, Your Honor. I only mean that to say that under the totality of the circumstances, the jurors in this case were not likely to come forward as the jurors were in Pena to report the misconduct. I see that I am out of time, and I respectfully ask that this Court reverse under the totality of the circumstances, alternatively remand under Pena-Rodriguez. Thank you. Thank you. The government saying now that this entire contract was a sham was not the position that it took below, nor did the district court, to my recollection, ever say that it was a sham during the sentencing proceedings. Even Mike Ward did not testify that when this whole, what he called the scheme, this bribery scheme was concocted, that this educational consulting firm was just going to be a sham and that it was not going to be providing any educational services. In fact, if it had only provided less than $21,000 worth of services, Floyd's offense level would be two points lower than it is now. And when a district court improperly calculates the guideline sentence, it is procedurally unreasonable and requires remand. I would point out that there was more work done than the government is reporting. We have very little time, and I want to ask about one point that your opposing counsel made that seems to be dispositive, and I hadn't really thought about it, so I'd like to ask you about it. She says that when counsel below, I don't know if it was you or the other counsel, but argued that it should only be $160 instead of $420 or whatever the numbers that you were giving us a few minutes ago, that when that argument was made, that was based on an apportionment among the various conspirators rather than based on a reduction for services supplied. Is that a mischaracterization of what was argued below? I believe that it is, because he didn't talk about apportionment of conspirators. What was the basis that was argued? Well, the basis was based upon the trial evidence wherein Mr. Floyd's own testimony and the testimony of other witnesses established that Global did earn, in his view, approximately $22,000 a month. I'll go look at it where you're both talking about the arguments at sentencing, right? Yes. So you're saying that if at sentencing, if we go look at the transcript at sentencing, we're going to find arguments about services supplied rather than or instead of arguments about apportionment among the different conspirators, whereas your opposing counsel says the opposite. We can go look at either one or the other, but is that fair? That's what you're saying it will say? No, because he did not specifically propound any calculations. He based his figure on the trial testimony, and he didn't specifically go to that. There may have been a comment about apportionment, but it was very minimal. I'm less concerned about whether there was a comment about apportionment than concerned about whether there was something indicating that this reduction was based on services supplied at sentencing. Because if not, it's like it wasn't raised. Well, Your Honor, that would be a problem for the government then, because all the sentencing courts do, they've done it in Randolph. This court has done it in Jones, Watkins. They look at the trial court evidence as part of the available evidence in order to determine the amount of loss. Look at the trial court evidence. I'm not arguing about that. I'm not questioning. I'm not concerned about that. I'm concerned about whether you raise this argument that you're making now that there should have been a reduction for services rendered. Before you answer that, I understood you to tell me earlier that that argument was not raised at sentencing. In terms of? I asked you earlier about whether as an analytical framework for sentencing, your client argued to the district court that the total amount of loss should have been reduced by services rendered, actual services rendered. He did not specifically use those terms. He said his calculation of the loss was $165,000, which corresponded to the evidence presented at trial by both the government and by his own witnesses. Didn't say what the theory was, though. So it could have been an apportionment or it could have been services rendered, one or the other. Is that right? We'll go look. Yes, but I don't see how he could have. If they don't raise it. He did not get $165,000, so he couldn't have been saying that it was based upon apportionment. I'm just thinking in terms of the district court. I mean, we don't usually reverse the district court on things that aren't raised. The district court is supposed to have an obligation to make factual findings with regard to its sentencing. The district court was entirely capable of making factual findings as to the total loss. It had conducted the trial. But, I mean, the defendant has some other basis on which he thinks the loss should be calculated, regardless of who has the burden of proof. He's got the obligation to articulate the argument so the district court can have some clue as to what the alternative methodology might be. Well, I would just simply argue that the problem is that we're shifting burdens, whereas we had all of this trial court testimony. Well, assume that I tell you the problem is not that you're shifting burdens, but whether you raised the argument or not. And the answer to that question, as far as I can tell, is no, we did not raise the argument. The argument was raised in a brief way in terms of saying the value of the services was... I have read what the objections to the pre-sentence report say, and they don't say a thing about value of services. At the sentencing, Dr. Floyd's attorney said he thought that the court's $420,000 calculation amount of loss was wrong, and it would be approximately $165,000. I think we got it. I got it. We got it. All right, anything else? We appreciate the argument all of you have given. We're particularly grateful to the appellate litigation clinics at the University of Michigan and the University of Virginia for accepting the appointments in these cases. And in particular, I'd like to recognize Ms. Sandler, Ms. Pickus, and Ms. Races, am I getting that correct, for your argument and your advocacy here today. You're well on your way to promising careers, and we thank you. Thank you.